## MEAD v. CHICKASHA GAS & ELECTRIC CO.

No. 17845. Opinion Filed April 16, 1929.

Rehearing Denied June 11, 1929.

ment of the substantial facts relied on for recovery and consistent with the facts hereinafter detailed. The negligence alleged is that defendant dug and negligently left open a certain test hole or excavation near to the place of certain repair work which the plaintiff was called upon by the defendant to do on its gas line in Chickasha, Okla., and that the said hole or excavation was so near such work and was left in such condition that the plaintiff could not and did not discover the same, but that he, while acting with due care, drove his automobile into the same resulting in an explosion of a certain acetylene generator tank which was thrown from plaintiff's automobile, whereby plaintiff suffered permanent injuries, resulting in deformity to his left arm and hand, and substantial loss of vision. The answer of defendant consisted of a general denial and special denial that it had any contract with plaintiff for the performance of such repair work, but alleged such contract with the Micro Grinding & Welding Company; denied that the defendant dug or permitted to stand open, or had any knowledge of, any such test hose as described in planitiff's petition; denied that it had any contract with plaintiff or owed him any duty, and also pleaded contributory negligence on the part of plaintiff, to which answer a formal reply by general denial was filed.

Upon the trial of the case at the conclusion of plaintiff's evidence, a general demurrer thereto was filed by the defendant, which was, by the court, sustained, and from which action of the court the plaintiff prosecutes this appeal.

The single question involved must be determined from the evidence, a substantial resume of which is as follows:

Defendant, Chickasha Gas & Electric Company, a corporation, was engaged in selling and distributing natural gas and electric current in Chickasha, Okla. Its main gas pipes were buried at a depth of from two to four feet underground. Defendant was repairing these gas lines to prevent the escape of gas through leaks at numerous joints thereof, and, in order to locate such leaky joints, it adopted the plan of sinking a pipe into the ground at or near the joints whereby the escaping gas would come through the pipe to the surface, the gas being indicated by touching a match to the exposed end of the pipe; and where the flame indicated the escape through the pipe of such gas, the defendant would there sink a test hole down to the defective joint

Barefoot & Carmichael, for plaintiff in error.

Melton & Melton, for defendant in error.

BENNETT, C. This was an action for damages brought by Arthur Mead, as plaintiff, against Chickasha Gas & Electric Company, a corporation, defendant, in the district court of Grady county, Okla. The parties appear in this court in the same relative positions as they appeared in the trial court, and they will be referred to herein as plaintiff and defendant.

The plaintiff's petition is a formal state-

for the purpose of determining whether the loss of gas at such point was substantial. The dimensions of these test holes varied from one to several feet in length, and perhaps about as wide as the main gas pipe being tested. If it was determined that the loss of gas was slight, the test hole was refilled, and another joint was examined, but if the loss was serious, an excavation was made around the defective joint so as to permit a welder to reach any part of the joint and weld the same. The size of these welding holes was approximately six to eight feet in diameter and of sufficient depth to uncover the defective joint. All excavations were made by the defendant, and when these welding holes were competent within a certain district, it notified the welders that the holes were complete and ready to be welded, and the welders, with their own equipment, welded the defective joints, being paid for the services about $4 per hour.

The Micro Grinding & Welding Company seems to have been a trade name of one Boydston, who had a shop, tools and welding outfit in Chickasha, and plaintiff was associated with Boydston in said shop under an arrangement whereby the plaintiff did the welding and received as his compensation one-half of the proceeds of the work done by plaintiff, the other one-half going to Boydston. This arrangement had existed for perhaps a year before the date of injury. Boydston did very little welding himself, and that only when plaintiff was not present.

A welding outfit complete consists of a metal acetylene generator tank, which is a cylindrical tank about 2 to 2 1-2 feet in diameter at the base, and about 14 inches at the top and about five feet in height and weighing from 350 to 400 pounds. The tank is divided into two parts, the lower (and larger) compartment containing water and the upper containing carbide. The gas is generated by permitting a portion of the carbide from the upper compartment to drop into the water in the lower compartment, and it seems that there are two valves, one which permits the gas to escape from the upper chamber and the other to free gas from the lower chamber when the pressure becomes excessive. A hose about 15 feet in length is attached to this generator tank and the other end of which is to be attached to the torch by which the welding is done, the gas furnishing the fuel for heat in welding. There is a second cylindrical metal tank which weighs from 150 to 175 pounds and contains oxygen. This latter cylinder is about five feet in length. This equipment is carried to the various places of work on a Ford roadster truck, the acetylene generator tank being placed in an upright position on the floor of the truck immediately behind the driver's seat, the oxygen cylinder along with other minor equipment being placed lengthwise beside the acetylene tank, and on the right-hand side of the acetylene tank.

Under the terms of employment, the defendants were to do all the excavation and refilling work, and it seems to have been understood that when the defendant completed the excavation of its welding holes, it should notify plaintiff or the Micro Grinding & Welding Company that the welding holes were complete and ready for the welding to be done. Under this arrangement, welding had been done for two or three days prior to July 21st by plaintiff for defendant in a nearby alley. It was the custom of defendant to fill up its test holes immediately after discovering that no leak was indicated therein, but where a considerable leakage was found, of course the welding holes were excavated as hereinbefore indicated at the point and around the test holes showing the waste.

On the morning of July 21, 1923, the foreman of defendant came to plaintiff's workshop and notified him that certain welding holes were complete in a 20-foot alley running north and south in a block bounded by Fifth and Sixth streets and Dakota and Idaho avenues, and asked him to proceed to weld the defective joints in said welding holes; that plaintiff, after loading his welding outfit in his Ford truck in the manner indicated, proceeded to such alley entering same from the north where it intersects with Dakota avenue and drove down the east side of the alley to a point near the first welding hole, and completed the welding therein, thence straight south about 40 or 50 feet to a second welding hole and completed the welding therein, from which point he drove south towards a third welding hole which was some 50 or 75 feet distant. As he approached the last hole plaintiff discovered that the defendant's employees had thrown the dirt from the last hole on the north, east and west sides of said hole, making an embankment from three to four feet high around the three approaches to the same so that it was impossible for plaintiff to pass with his truck on either side thereof, or to approach near enough to the hole to use his equipment in welding the defective joint located in said hole. The only alternative left the plaintiff was to drive back

up the alley, go around the block, and approach the last hole from the south, entering the alley on Idaho avenue; that, on account of the narrowness of the alley and the fact that there lay to the north of his vehicle two large excavations of sufficient size to engulf his entire machine and equipment, if he ran into them, and the further fact that there were buildings on the east side of the alley opposite said excavations and the margin of safety for driving between said excavations and the said buildings was very small, plaintiff decided to turn his car around in the alley and drive out the way he came rather than risk the danger incident to backing out; that in attempting to turn his car around the rear left wheel of his truck ran into a test hole which he could not and did not see and which had been left unfilled by the defendant, and that, by reason thereof, the acetylene generator tank was thrown out of the car and in such position that the top or upper part thereof stuck in the ground and the other end rested against the side of the truck; that plaintiff, seeing the danger and realizing that the position of the water and carbide in the tank was reversed and that the water in volume would come in contact with the carbide and that almost immediately sufficient gas would be formed to explode and destroy the acetylene tank, and perhaps to set off also the oxygen tank which he knew was highly explosive and dangerous, rushed around to the inverted tank and turned the valve which to an extent released the gas in one compartment, and while attempting to release the other valve to avert disaster, the tank exploded, lacerating, breaking, and permanently injuring plaintiff's left hand and arm, and burning his eyes and permanently injuring the sight thereof. The evidence is to the effect that this alley was in a thickly settled neighborhood; that some of the residences were perhaps within 65 or 70 feet of the place of the explosion, and that plaintiff knew that if the generator and oxygen tanks blew up that the force might wipe out the whole block and kill those persons in close proximity. Plaintiff's statement is that the time intervening between the falling of the tank and the explosion was perhaps a minute or a minute and a half, and that if he had taken no thought other than for his own protection, he could have gotten a sufficient distance away to have suffered no personal injury; but that he wished to protect others against the explosion; that he did not take this risk to save the tank or the equipment, but that his mind was constantly on the danger in case both tanks blew up; that he had had no actual experience in the explosion of oxygen cylinders, but from what he had read, he knew that they were highly dangerous, and that there is a warning on every cylinder which says "Don't drop"; that he does not know how long he was in getting to the tank after the car dropped into the hole, but that he got there as quickly as possible. There is proof also that these test holes, of which the one in controversy was one, were dug at least a day or two before the date of the injury. Plaintiff did not see the hole until after he went around the car just before the explosion and at that time he saw the wheel of his car down in the hole.

One witness testified that he helped dig these holes, and that some loose dirt was shoveled back into the hole, but that it was not tamped. Another witness saw the hole a day or two after the accident, and said that it was a small hole, but showed the depression caused by the drop therein of the car wheel, and that it was one of the test holes which had been dug by witness and others. Witness Strieftersbach testified that he was present in the alley on the morning when the plaintiff came there, and that he and other workmen were at work there, but that his foreman, Mr. Thompson, who had charge of the men, called these men off the work there and carried them over to Missouri avenue to work on a gas line, and at the time they left, Mead, the plaintiff, was welding in the first hole in that part of the alley. The following questions were asked this witness:

"Q. Had this same bunch of men you spoke of there, had they dug holes in the alley south of there? A. Yes, sir. Q. Were the men familiar with the character of vehicle that he had in order to do this welding? A. It was a Ford roadster with a small bed on it. Q. When had these holes been dug there, Mr. Strieftersbach, in this alley, with reference to the time of Mr. Mead's injury? A. Do you mean on that particular alley where he got hurt? Q. Yes. A. Oh, they had been dug the day before anyhow, I could not say whether they were dug a couple of days before or not, but they had to be dug the day before anyhow, because he came out there to work and do the welding in the hole, in the large hold, that morning. Q. If there was enough leak there to require welding, then you dug these big holes, didn't you? A. Yes, sir. Q. If there was not, what did you do? A. We would fill the test hole up."

The proof is to the effect that the alley is not entirely level, but slopes slightly towards

78

the north and east, the southwest corner of the alley on Idaho being the highest part and the northeast corner being the lowest part of the alley. Plaintiff testified that in driving down the east side of the alley, the decline was not sufficient to be noticeable, and, furthermore, that the acetylene generator tank fell over the side of his car towards the west as he was completing the turn of his vehicle and just before straightening the same out to drive due north. On cross-examination plaintiff was asked the following questions:

"Q. You got out on the right hand side of the car and came around all the way around the body of the car to this tank and took the cap off of it? A. Yes, sir. Q. Why did you do that? A. Well, I done it to keep the tank from exploding. Q. You thought it would explode, didn't you, if it was upset that way? A. I knew it would explode. Q. You knew you was taking a chance in going to it when you did it, didn't you? A. Yes, sir. Q. But you—but to save a little tank of that kind and the stuff that was in it, you took chances of losing your own life by going around there and trying to take that plug out? A. No, sir. Q. Didn't you know you were taking chances? A. Yes, sir, but I was not trying to preserve the tank. Q. Why did you do it? A. I knew it would probably destroy lives and property. Q. It did explode, didn't it? A. Just the top of it. Q. It did not destroy anything? A. The top of it blew off. Q. That is all that could have blown out if you had not taken the plug out? A. I released the main part of the tank. * * * Q. Who was it that was in any danger? A. All that property and all those people. * * * Q. She (a lady being the first person he saw) was not hurt? A. No, sir, because the explosion was not as big as it would have been if I had not released the tank."

From the briefs in the case, it appears that the trial court sustained the demurrer of the defendant upon the grounds: First, that there was no evidence of primary negligence upon the part of defendant; and, second, upon the ground that the negligence complained of was not the proximate cause of the injury.

Upon a very careful reading and rereading of the evidence in this cause, we are driven to the conclusion that the trial court was in error as to each of these propositions.

It is the contention first by the defendant that because plaintiff was not an employee of the defendant, it owed him no duty which is a prerequisite to actionable negligence. Under the demurrer of defendant all the testimony of plaintiff, together with such favorable inferences as may be reasonably

drawn therefrom, must be accepted as true. The following outstanding facts and deductions admit of no controversy:

First. Plaintiff through the trade name was employed by defendant to do this welding; the defendant must have understood what equipment was to be used because it had required just such work before from the plaintiff.

Second. It was defendant's duty to complete the excavation of the welding holes before calling upon plaintiff to pursue his work, and certainly if those welding holes had been negligently dug so as to greatly increase plaintiff's hazard, liability would follow.

Third. The test holes which the defendant for its own information and convenience dug had been completed a day or so before the accident and had completely served their purpose. They had indicated where gas was escaping in quantities—some of them had indicated that—and had become locations for the weldings holes. The others had indicated to the contrary, and, under the testimony, should have been properly filled up immediately.

Fourth. That 20-foot alley was made to be traveled by those having business therein, and the leaving open of excavations after they had served their purpose and were no more required in the prosecution of the work, there was certainly evidence of negligence. If they were left open for two days, might they not have been left open for two weeks or two months?

Fifth. The exact dimensions, length, width and depth of this offending test hole are not shown, but it is true beyond cavil that it was long enough and wide enough for the wheel of plaintiff's truck to drop into it, and just as true that it was deep enough to throw out of plaintiff's truck the metal generator. The most casual observation would convince one that such result could not follow unless the wheel sank suddenly and as far into the hole as the axle would permit.

Sixth. The defendant called off its hands from this work while the plaintiff was actually at work within the block without notifying the plaintiff of the presence of any hole or without warning him against it, and with the knowledge of his equipment and the manner in which it was used, including the knowledge that he must drive by or very near to, if not actually cross or into, these test holes or over the same if they had been filled.

Seventh. There is some proof to the effect and the defendant actually contends in its brief that this test hole was filled with loose dirt, and that other new earth was scattered around the place occupied by the test hole. If that be accepted as true, in the light of the fact that plaintiff's car ran into it with such terrible result, the refilling of this hole, the method of filling this hole, constituted nothing short of a trap, indicating that the hole had been filled, and inviting confidence in such fact, whereas, in truth, it was but an invitation to disaster. The hole might just as profitably have been filled with leaves, so far as the apparent effect is concerned.

Eighth. It is true that the alley sloped slightly, but this was towards the north and towards the east. The only proof in this case is that the tank was thrown out of the car towards the west, which would negative the thought that the grade had anything to do with the falling of the tank from the car.

Ninth. It is entirely clear from the proof, which went in without objection, that the throwing up of the dirt embankment on the north, east and west of the third welding hole, made it necessary for the plaintiff to either back his car or to turn around and drive to Dakota avenue so that the last hole might be approached from the south.

Tenth. There is no suggestion in the evidence that would tend to account for the falling of the tank from the car, except as the result of the wheel dropping into the excavation, nor is there any evidence of plaintiff's neglect, unless it were his failure to see the hole, the existence of which he had no right to suspect, or his failure to discover that the excavation, though apparently refilled, was, in fact, but an open danger, but all of these matters were, of course, for the jury.

Eleventh. The alley is shown to have been 20 feet wide and in good condition for travel by automobile. Under sections 4563 and 4564, C. O. S. 1921, alleys and streets are dealt with much alike. In some states they are held to rise almost to the dignity of streets. Bailey v. Culver, 12 Mo. App. 175-183; DeBolt v. Carter, 31 Ind. 355-367; Kalteyer v. Sullivan, 46 S. W. 288-290, 18 Tex. Civ. App. 488.

In the case of Beck v. Carter, 68 N. Y. 283, 23 Am. Rep. 175, it was held that:

"If the owner of land made an excavation thereon adjacent to a highway, or so near as to make the use of the highway insufficient or dangerous, he will be liable to the traveler, who, while using ordinary care, falls into it and is injured."

The foregoing is quoted with approval in Connally et al. v. Woods et al., 39 Okla. 186, at p. 189, 134 Pac. 869, and the court in that case adds, referring to the Beck Case:

"In that case the injury occurred upon an alley, and it was held that it was immaterial whether the alley had been accepted by the public so as to make it a highway."

The court in the opinion, quoting from the case of Buesching v. St. Louis Gas Light Co., 73 Mo. 219, 39 Am. Rep. 503, says:

"'It cannot be laid down as a legal proposition that one who falls into an unconcealed opening adjoining a highway is guilty of negligence * * * in not avoiding it. The true rule is that he is guilty of negligence if he did not see it, provided he would have seen it by exercising ordinary care, and if he saw it, he is guilty of negligence in not avoiding it, provided he could have avoided it by the exercise of ordinary care.'"

Quoting from the case of City of Norwich v. Breed, 30 Conn. 535, the court also quotes the following:

"'As a (the) dangerous character rather than the exact location of the excavation determined the duty and consequent liability of the city in regard to it, so the duties and liabilities of the defendant in this respect must be determined by the same criterion. His right to make the excavation was undeniable, and was not denied; but he was bound to exercise that right with a due regard to the co-existing rights of the city and of travelers on the street. "Sic utere tuo ut alienum non laedas" is a maxim as universal in application as it is wise and just in principle.'"

It must be quite clear that the plaintiff and the defendant, while not working together, nor even exactly at the same time, were required to perform certain work in the completion of the general task. The defendant was required to make his explorations and determine where gas pipe needed attention and to excavate down to and around the defective joints of such places. This, of course, contemplates that the test holes would either be filled up or become the location of welding holes. Thereupon the plaintiff was to complete in the welding holes the repair of the gas pipe, and then the defendant would complete the job by refilling the excavations. We think it was as much the duty of defendant to properly fill up the unused test holes as it was to correctly excavate the welding holes. If,

in fact, and as a matter of law, it had the right to leave open or insufficiently filled one test hole, which was useless and had served its full purpose, they had a right to leave a score of such to menace the plaintiff in the performance of his task, and this to our minds is unthinkable.

We hold, therefore, that there was evidence of primary negligence on the part of defendant which should have been submitted to the jury.

2. Was the negligence of defendant, assuming it to have been proven, the proximate cause of plaintiff's injury? As we see it, there are only two possible contentions which the defendant might urge. The first is that there is no causal connection between the failure to fill up the excavation and the explosion which injured plaintiff. The general rule as stated in 22 R. C. L. pp. 134-5, is as follows:

"It is universally agreed that the mere fact that the intervention of a responsible human being can be traced between the defendant's wrongful act and the injury complained of will not absolve him. (Citing cases from Indiana and Massachusetts).*** The question always is, Was there any unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury." (Citing many cases.)

"The true rule is that what is the proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a fact, in view of the circumstances of fact attending it." Milwaukee & St. P. Ry. Co. v. Kellogg, 94 U. S. 475, 24 L. Ed. 256; Thompson on Negligence, p. 1286; Shearman & Redfield on Negligence, sec. 55; Brown v. Chicago, M. & St. P. Ry. Co., 54 Wis 342, 11 N. W. 356; Cole v. German Savings & Loan Society, 59 C. C. A 593, 124 Fed 113.

In St. L. & S. F. R. Co., v. Davis, 37 Okla. 340, 132 Pac. 337, the eighth paragraph of the syllabus is as follows:

"The proximate cause of an injury is ordinarily a question for the jury. It is not a question of science or of legal knowledge. It is to be determined as a question of fact, in view of the circumstances of fact attending it."

And in the opinion, at page 348, the court says:

"All the acts done by the plaintiff and from which the injury flowed were rightful on her part, and compelled by the act of the defendant. There was no intervening, independent cause. It must therefore be held that the injury to the plaintiff was the direct result of the defendant's negligence and that such negligence was the proximate and not the remote cause of the injury. In other words, as said by Lord Ellenborough in Jones v. Boyce, 1 Stark. 493: 'If I place a man in such a situation that he must adopt a perilous alternative, I am responsible for the consequence.' So, as has been seen, the defendant by its negligence placed the plaintiff in a position where it was necessary for her to act to avoid the consequences of the wrongful act of the defendant, and, acting with ordinary prudence and care to extricate herself from the difficulty in which she had been placed, she sustained the injuries complained of. The true meaning of the maxim, 'Causa proxima non remota spectatur,' is defined in Kellogg v. Railway Co., 26 Wis. 223, 7 Am. Rep. 69, as follows: 'An efficient, adequate cause being found, must be considered the true cause, unless some other cause, not incidental to it, but independent of it, is shown to have intervened between it and the result.' Where there is no intermediate efficient cause, the original wrong must be considered as reaching to the effect and proximate to it. Milwaukee & St. P. Ry. Co. v. Kellogg, supra."

In the case at bar there is an unbroken sequence. The defendant left the hole open or insufficiently filled, which caused the car to drop and throw the tank off the car and onto the ground, and this loosed the substances which, by chemical action, produced the gas which caused the explosion injuring plaintiff. It was not needful that defendant should have been able to foresee the exact nature of the resulting injury. Kroll v. U. P. Ry. Co., 106 Kan. 294, 187 Pac. 661-663; Hartnett v. Boston Store, 265 Ill. 331, 106 N. E. 837. The defendant set in motion, by its wrongful act, those elements calculated to produce injury, and it is liable therefor.

The other alternative relied on by defendant is that the plaintiff, by his own effort and of his own volition, placed himself in a position of peril and became therefore responsible for his own hurt. This contention does not commend itself to our consideration. All the evidence shows that plaintiff did not have a dime invested either in the acetylene tank, the oxygen tank, or their contents, or the truck bearing the same, or the other equipment therewith. His statement, therefore, that while he knew the danger, yet the preservation of the lives of others, as well as the preservation of their property, was uppermost in his

mind, is all the more credible and convincing. And the law in such case has always been and should always be that where one under stress when put suddenly in peril acts upon impulse and follows those instincts which are highest in humankind—to save others—he will not thereby, as a matter of law preclude himself from asserting his rights as against those who have made such a commendable, but disastrous, choice necessary.

For the reasons given, we hold that the trial court erred, and that the cause should be reversed and remanded for a new trial in conformity with the views herein expressed.

REID, LEACH, JEFFREY and FOSTER, Commissioners, concur.

HUNT, J., dissents to denial of petition for rehearing.

By the Court: It is so ordered.

Note.—See under (1) 20 R. C. L. p. 180; 7 R. C. L. Supp. p. 670. (4) 22 R. C. L. p. 148; 3 R. C. L. Supp. p. 1240; 4 R. C. L. Supp. p. 1458; 5 R. C. L. Supp. p. 1196; 6 R. C. L. Supp. p. 1318; 7 R. C. L. Supp. p. 728. See "Motor Vehicles," 42 C. J. § 572. p. 869, n. 67. "Negligence," 45 C. J. § 751, p. 1167, n. 5; § 752, p. 1168, n. 13; § 835, p. 1268, n. 41; § 876. p. 1316, n. 10. "Trial," 38 Cyc. p. 1543, n. 69.