## HASKELL et al. v. KENNEDY.

No. 20581. Opinion Filed July 21, 1931.

Walter L. Gray and John L. Arrington, for plaintiffs in error.

Gray & Palmer, for defendant in error.

RILEY, J. This is an action commenced by defendant in error, a minor, by his father and mother as next friends, hereinafter referred to as plaintiff, against plaintiffs in error, hereinafter referred to as defendants, to recover damages for personal injuries alleged to have been received by being struck by an automobile driven by an employee of defendants along Main street in the town of Fairfax, Okla. The injury was alleged to have been received on February 5, 1928.

The petition alleges, in substance, that plaintiff was three years of age, and on the 5th day of February, 1928, was playing in the parking in the center of Main street in front of his home in Fairfax, Okla.; that one Ben Johnson, the servant, agent, and employee of defendants, while on an errand for defendants, drove the automobile belonging to defendants at a great and excessive rate of speed, some 35 or 40 miles per hour, and at a rate of speed prohibited by an ordinance of said town of Fairfax, over and

along said street, and as it approached the place where plaintiff was playing, the automobile swerved from the paved portion of the street, up over the curb and on to the parking where plaintiff was at play, and struck plaintiff, knocking him down and into the gutter, whereby he was seriously and dangerously injured, etc.

It further alleged that defendants and their said employee knew that children were in the habit of playing in said parking, and that said employee knew at the time that children were at play therein, and was negligent in failing to keep a proper lookout for said children, and the defendants were also negligent in that the brakes on said automobile were not kept in good condition.

The ordinance of the town of Fairfax fixing the speed of automobiles on the street, at the place where the injury occurred, at 15 miles per hour, was pleaded, and a copy thereof attached to the petition.

Defendants answered by general denial, and also alleged, in substance, that their car was being driven by a careful driver, who had been employed by them as "chauffeur"; was being driven at a reasonable rate of speed and within the rate allowed by the laws of the state of Oklahoma, and while passing another automobile that stood parked on the paved street, plaintiff negligently and carelessly stepped out into the street from in front of said parked automobile directly in front of defendant's car, and that the driver did not observe him until he came in view from behind the parked car, and that when the driver observed or saw plaintiff, he used all reasonable diligence to avoid striking him, and in so doing swerved the car to the left and applied the brakes and in so doing unavoidably struck plaintiff, and that the injury, if any, was the result of unavoidable accident, and was not caused in any way by the negligence of the driver. It further alleged contributory negligence on the part of plaintiff, and specifically denied that the ordinance pleaded by plaintiff was a valid or legal ordinance of the town of Fairfax.

Plaintiff replied by general denial.

The cause was tried to a jury resulting in a verdict and judgment for plaintiff in the sum of $5,000. From this judgment and the order overruling motion for a new trial, defendants appeal.

The first assignment presented is that the court erred in overruling the demurrer of defendants to plaintiff's evidence, and in re-

fusing to direct a verdict for defendants at the close of all the evidence.

This assignment cannot be sustained. We deem it unnecessary to review the evidence at length, but think it sufficient to say that the plaintiff produced evidence reasonably tending to prove every material allegation of his petition. There was much conflict in the evidence as a whole. Defendants produced evidence tending to support their allegations of unavoidable accident. The evidence being in conflict, the questions of fact involved were necessarily for the jury. There was no error in overruling the demurrer to plaintiff's evidence, and in refusing to direct a verdict for defendants.

It is next contended that the court erred in admitting in evidence the ordinance of the town of Fairfax pleaded by plaintiff. When the ordinance was offered in evidence by plaintiff, defendants objected to the introduction thereof in the following language:

"Comes now the defendants and objects to the introduction of this ordinance, it having not been shown that this ordinance was passed and published as required by section 4524 of the 1921 Compiled Statutes of Oklahoma."

Section 4524, C. O. S. 1921, referred to in the objection, applies to an ordinance book required to be kept by the city clerk of a city, and makes no mention of any requirement as to publication of ordinances except that the clerk is required to state in the ordinance book the name and date of the newspaper in which the ordinance was published.

Section 4521, C. O. S. 1921, is cited and relied upon together with Marth v. City of Kingfisher, 22 Okla. 602, 98 Pac. 436. Although that section requires the publication of an ordinance, it applies only to ordinances of cities and has no application to ordinances of towns. The law relative to publication of ordinances enacted by towns is found in subdivision 17 of section 4762, C. O. S. 1921, which, among other things, provides:

"* * * but every by-law, ordinance or regulation, unless in case of emergency, shall be published in a newspaper of such town, if one be printed therein, or posted in five public places, at least ten days before the same shall take effect."

The ordinance in question contains an emergency clause in the following form:

"Section 5. An emergency is declared to exist whereby it is necessary for the immediate preservation of the public peace, health, and safety that this ordinance shall take effect and be in full force from and after its passage and approval of the board of trustees."

By the plain provision of subdivision 17 of section 4762, supra, the ordinance was not required to be published, and the objection of defendants was therefore properly overruled.

The contention, as made by the defendants in their brief, was that the ordinance was improperly admitted for the reason that, it being amendatory, it does not contain the entire sections purported to have been amended and does not repeal either of the old sections, as required by section 4522, C. O. S. 1921. This question was not presented to the trial court, and we doubt the right of defendants to raise it here for the first time. However, we have carefully considered the question presented, and are unable to agree with defendants' contention. The only case cited by defendants on this point is Pentecost v. Stiles, 5 Okla. 500, 49 Pac. 921. In that case it was held:

"In amending a section of a city ordinance, it is not necessary to incorporate into the amendatory section the provision of the ordinance to be amended; but what is required is that the amending section shall contain the entire provision on the subject contained in the old section, and which it is desired to enact by the new section, thus leaving the former section as entirely repealed."

If section 4522, supra, be applicable to the amendment of ordinances by towns, there is nothing in the record to show that the amending sections do not contain the entire provisions on the subject contained in the old sections, thus leaving the former sections entirely repealed. Defendants do not point out wherein the ordinance fails to comply with section 4522, supra, if applicable under the rule announced in Pentecost v. Stiles, supra.

Defendants next contend that there was error in giving instruction No. 9, wherein the court told the jury under what circumstances defendants would be liable for the acts of negligence of the driver of their automobile, and told the jury that if they found by a fair preponderance of the evidence that the driver of the car was guilty of such negligence, which was the proximate cause of the injury, the verdict should be in favor of the plaintiff, etc., "* * * or if you find that the plaintiff, Jack Kennedy, was guilty of negligence which brought about his injury, your verdict should be for the defendants." It is to the quoted portion of the instruction defendants object. They

say that it is so indefinite and uncertain as to take from the jury altogether the question of contributory negligence.

The language used in the instruction is inaccurate in that the words "proximately contributed to his injury," or words to that effect, should have been used in connection with the words "brought about his injury." But we think when the instructions are read together, and particularly those on the question of contributory negligence, it will be readily seen that the jury could not have been misled by this slight inaccuracy. Furthermore, we think the defendants got all and more than they were entitled to in the instructions on contributory negligence. The court properly told the jury that the burden was on defendants to prove their affirmative allegations of contributory negligence, properly defined "negligence," and told the jury:

"You are instructed that 'contributory negligence' is negligence of the plaintiff, or of the person on account of whose injury the action is brought, amounting to a want of ordinary care, and proximately contributing to bringing about the injury complained of. In order to constitute such negligence as will bar a recovery for damages, two elements must concur: first, a want of ordinary care on the part of the plaintiff; second, a proximate connection between this want of ordinary care and the injury complained of."

When applying the definition to the plaintiff in the instant case, the court said:

"The question is, has the care, diligence, or skill demanded by the peculiar circumstances of the particular case been exercised? If so, there is no negligence; if not, there is negligence. The plaintiff was not negligent if he exercised reasonable care; he was negligent if he failed to do so. His conduct, like that of the defendant, is to be estimated by what a reasonable and prudent man would have done under the circumstances."

The jury was thereby told, in effect, that the degree of care required of plaintiff was that of an ordinarily prudent man. In another instruction the jury was told, in effect, that plaintiff, in order to recover, must have been "without any fault" upon his part. Certainly, defendants ought not to be heard to complain that the question of contributory negligence was taken from the jury. Especially so, when we consider that the plaintiff at the time of his injury was a minor but three and one-half years of age. All the responsibilities of a grown man of ordinary prudence were placed upon him by the court in its instructions. The jury under such circumstances could not be misled to

defendants' prejudice by the slight inaccuracy pointed out.

Defendants next complain of instruction No. 10, given by the court, in which it was said if the jury should believe, from all the facts and circumstances in proof, that the driver of defendants' car was operating said car in a careful and prudent manner, having due regard for the safety of others, and plaintiff ran out into the street in front of said automobile in an attempt to cross the street, and that the driver of the car, after the discovery of the peril of plaintiff, used every effort to avoid the injury, but it was impossible for him to do so, then and under such circumstances the accident would be classed as unavoidable, and, under such circumstances, plaintiff could not recover.

It is contended that, by telling the jury that if the driver, after discovery of plaintiff's peril, used every effort to avoid the injury, but that it was impossible to do so, the accident would then be classed as unavoidable, the court placed a greater burden upon the driver of the car than the law requires. Defendants contend that in cases of discovered peril, all that is required is to use ordinary care, and if that is done, and the driver was not guilty of actionable negligence before the discovery of the peril, the accident would then be classed as unavoidable.

This court, in Wilson v. Roach, 101 Okla. 30, 222 Pac. 1000, defined an "unavoidable accident" as follows:

"An unavoidable accident is a casualty which occurs without negligence of either party, and when all means which common prudence suggests have been used to prevent it."

This definition seems to be a combination of those used in Galveston, H. & S. A. R. Co. v. Gormley (Tex. Civ. App.) 35 S. W. 488, and Hodgson v. Dexter (U. S.) 12 Fed. Cas. 283.

In Wilson v. Roach, supra, it was said:

"The quantum of care required is to be estimated by the exigencies of the particular situation, and is usually a question of fact for the jury."

Applying this principle we think the instruction given, while not in strict accord with the definition of "unavoidable accident" usually given, fairly states the quantum of care required by the exigencies of the particular situation.

In Muskogee Elec. Traction Co. v. Tice, 116 Okla. 24, 243 Pac. 175, this court approved an instruction in the following form:

"* * * If you believe from the evidence that the plaintiff did not observe the approaching street car, but that the motorman on said street car saw the plaintiff, and when the motorman, otherwise in the exercise of ordinary care, observed that the plaintiff was not going to stop, then it was the duty of the motorman to use every means reasonably within his power to stop the street car and avoid a collision, and if he failed to do this, then your verdict should be for the plaintiff."

In Blashfield's Cyc. of Automobile Law, vol. 2, p. 1921, the following rule is stated:

"If the person sought to be charged under the last clear chance doctrine, after discovering the peril of the injured person, uses all the available means at his command to avoid striking him, he discharges his duty thereunder."

In some cases the driver is required to use the highest degree of care to avoid injury after discovery of peril. It would, therefore, seem that the general rule is that degree of care required, after the discovery of peril, is greater than ordinary care. The cases cited involve what is known as the doctrine of last clear chance, or doctrine of discovered peril. But if in observance of these rules an injury occurs, it could be classed as an unavoidable accident, and it is difficult to understand how it could be said that, if after the driver of an automobile discovers a pedestrian in a position of peril because of the near approach of his vehicle, and fails to use every effort within his means to avoid injury, if one occurs, it is the result of an unavoidable accident. The plaintiff was not relying upon negligence under the doctrine of last clear chance, but defendants, in substance, invoked that doctrine, and contended that the driver used ordinary care until the discovery of the peril of the plaintiff, and that all that was required after the discovery of the peril was "ordinary care."

We think the instruction, while not entirely accurate, states the law substantially, requiring the use of all available means at the command of the driver and does not require a reversal when applied to the particular facts and circumstances in the instant case. Certainly not where defendants, as in the instant case, fail to point out to the trial court the particular objection thereto, and failed to suggest or request a proper instruction on unavoidable accident.

Objection is made to instruction No. 11, which, in effect, told the jury that the driving of an automobile along the streets of the town of Fairfax in excess of the lawful rate of speed as fixed by the ordinance would be negligence per se, and if the jury should find that the defendants' car was being so driven, and as a result thereof plaintiff received the injuries complained of, the verdict should be for plaintiff. The principal objection to this instruction seems to be that it assumed the validity of the ordinance, whereas the ordinance was claimed to be invalid. We have already disposed of the question raised as to the validity of the ordinance, hence, the objection to the instruction on that ground is not well taken.

It is contended that the term "proximate result" was not defined by this or any other instruction, and the jury must have been misled. The contention is without merit. What is meant by negligence as the proximate cause of an injury was fully defined by the court in instruction No. 6. No other definition was contended for or suggested by defendants.

Finally it is contended that the court erred in instruction No. 18, wherein the jury was told that if they found from the evidence that it was the custom of children to play about the parking in the street and cross the street back and forth in going to and from the parking (which in this case was shown to be a space about a block long in the center of the street between two paved driveways) and the driver of defendants' car knew of those habits and customs, it was the duty of said driver to watch out for such children and to keep his car under such control that he could stop without striking such children. There is no contention that this was not a proper statement of the law, but it is contended that there was no evidence whatever to show that the driver knew of these habits and customs of the children. There is no merit in this contention. There is an abundance of evidence from which the jury could reasonably infer that the driver of the automobile knew of the custom. The custom was shown to have existed some two years prior to the date of the injury. The street was the main street of the town leading out to defendants' residence. Ben Johnson, the driver of the automobile, was shown to have been employed by defendants for more than a year of that time. He was not so employed for a year immediately before the date of the injury, but the evidence does show that he was employed in that capacity for as much as a year after the custom was shown to have existed.

There being no substantial error, the judgment is hereby affirmed.

LESTER, C. J., CLARK, V. C. J., and HEFNER, CULLISON, and SWINDALL, JJ., concur. KORNEGAY, J., dissents. ANDREWS and McNEILL, JJ., absent.

---

KORNEGAY, J. (dissenting). I dissent from the action of the majority in affirming judgment in this case. The case resulted in a verdict, signed by eleven jurors, in favor of the plaintiff below, and assessing his damages at $5,000. The plaintiff below bases his right of recovery, as set forth in the petition, on account of an injury received on the 5th day of February, 1928, occasioned by coming in contact with a moving automobile belonging to the defendants, and driven by Ben Johnson, hired driver of an automobile of the defendants, who, at that time, was coming from an errand of taking the children of the defendants to a moving picture show in the town of Fairfax on Sunday afternoon. According to the petition, the plaintiff, when injured, was standing on a parkway some two feet from the curbing along a paved street in the town of Fairfax, Okla., and the automobile belonging to the defendants came over into the parkway, over the curb, and struck him. The allegation is as follows:

"4. That on said 5th day of February, 1928, and at the time this plaintiff was playing on the parking, as aforesaid, said Ben Johnson, while driving said car of said defendants and on an errand for the defendants, drove along said street in front of the home of the plaintiff at a great and excessive rate of speed, or some 35 or 40 miles an hour, and at a speed by the laws of the state of Oklahoma and by the ordinances of the city of Fairfax, Okla., a copy of which ordinance is hereto attached marked exhibit 'A' and made a part hereof, and that as said car, being driv.n by the said Ben Johnson, as aforesaid, for and on behalf of said defendants, as aforesaid, approached the place where the plaintiff was playing as aforesaid, and at such excessive rate of speed as aforesaid, darted from the paved portion of said street, up over the curb and onto the parking or boulevard in the center of said street, and struck the plaintiff in the back of the head and knocked the plaintiff down into the gutter and seriously and dangerously injured said plaintiff.

"5. That said injury was occasioned wholly and solely by reason of the fault of the defendants aforesaid and by reason of the neglect of the defendants and their employee as. aforesaid; that said employee was driving said automobile at a fast and excessive rate of speed and at such rate of speed that he ran up and over the curb for some 40 or 50 feet after said car had gotten entirely upon said parking, and that said defendants and their employee were further negligent in that they knew that children played upon said parking, and that said employee knew that said children were playing there at said time and said employee and said defendants knew that it was the custom and habit of small children to play upon said parking and in and around said street and that said defendants, frequently and almost every day and often many times a day, passed back and forth along said street and were thoroughly familiar with conditions there, and that said defendants and their employee were further negligent in that they did not watch to see if the plaintiff was there and in that they did not stop the car before striking said plaintiff and in that they drove said car, or permitted the same to be driven, upon said parking and in that they did not keep the car in good condition in that brakes were not kept in good condition."

The injury to the plaintiff is described in paragraphs 6, 7, 8, 9, 10, 11, 12, 13, and 14 of the petition, and judgment is asked against the defendants for $29,200, and the petition is endorsed:

"Lien Claimed
"Gray & Palmer,
"Attys. for plaintiff"

—and it is signed by them.

All of the details of the injuries, both actual and anticipated, are set out in the petition, and claim is made for mental pain and humiliation, and for loss of earning power after arriving at 21 years of age and until his death, which is fixed at $19,200. The damages for the physical and mental pain suffered and to be suffered is fixed at $10,000.

Complaint was made in a motion to strike of the use in the petition, as originally drawn, of the words, "that the defendants and each of them are members of the Osage Tribe of Indians and have large incomes and large estates." It was averred in the motion that this was not material and was prejudicial. The court struck out the allegation as to being Osage Indians, but left in the petition the statement about defendants having large incomes and large estates. The motion to strike complained of paragraph 5, above set out. Request was made that there be stricken from the petition paragraph 10, which is as follows:

"10. That by reason of the foregoing, the plaintiff has suffered and will continue to suffer great physical and mental pain, and that it is very highly probable that an-

other operation on the skull and brain will be necessary in which event the plaintiff will suffer further and additional pain and be caused further and additional expense."

And, also, paragraph 12, which is as follows: ·

"12. That by reason of the condition of plaintiff as aforesaid, caused by the negligence of the defendants as aforesaid, the plaintiff will have to go through life handicapped by said injuries as aforesaid, and will suffer great mental pain and humiliation· and will continue to go through his life suffering physical pain."

And, also, paragraph 13, which is as follows:

"13. That by reason of the foregoing, the earning capacity of the plaintiff has been injured and decreased at least 50 per cent. and that the ordinary length of life of the plaintiff was and is at least 50 years after the time of said injury, and that after the plaintiff arrives at the age of 21 years he should be earning at least $100 per month, and that he has therefore been damaged in the sum of at least $50 per month from the time he arrives at 21 years of age until his death, or a total of $19,200."

The court refused to strike out anything except that the defendants were Osage Indians, and the defendants excepted to the orders. This was followed by a motion to require the plaintiff to make his complaint at paragraph 4 more definite and certain, and also to require the plaintiff to more definitely and certainly plead the custom, alleged to exist in Fairfax, whereby children play in the streets, and on what the custom was based.

In the third paragraph of the motion, request was made to compel the plaintiff to show in what way the defendants did not keep their car in good condition. The court required the ordinance to be· attached, and overruled the balance of the motion,· and the defendants excepted. After a demurrer was overruled, an answer was filed containing a general denial, averring that the car was being driven by a careful driver, and that after he had crossed Locust street, and driving at a reasonable rate of speed, and at a slower rate of speed than the law of the state of Oklahoma permitted, and while in the act of passing a car, parked some 40 feet from the Locust street crossing, the plaintiff carelessly and negligently stepped out into the street directly in front of the defendants' car, and that the plaintiff had not been observed by defendants' chauffeur prior to· his stepping out from in front of the radiator of the parked car, the parked car being headed south, and that when the plaintiff did this, the chauffeur swerved the car to the left to avoid injuring the plaintiff, applying the brakes, took all reasonable diligence· to· avoid any injury to· the plaintiff, and did avoid striking him with a direct collision, and if the car struck the plaintiff at all, it was a glancing blow from the right rear fender.

They further pleaded that the accident was due entirely to the carelessness and negligence of the plaintiff, and was not due to any negligence or carelessness whatsoever on the part of the defendants. They further pleaded that the injury was an unavoidable accident, and they pleaded contributory negligence on the part of the plaintiff, the contributory negligence being that he was concealed from view of the defendants' car, and stepped out from the concealment directly in front of the defendants' car in a careless and negligent manner, and that without such carelessness and negligence, the accident complained of would not have occurred.

The opening statement of counsel for the plaintiff is found beginning on page 77 of the case-made. The accident happened on Main street in Fairfax, and in the block just south of the business section, according to the opening statement. The language of the attorney, on page 78 of the case-made, is as follows:

"The evidence will show that this boy was out in this parking or oval in the center of the street, and that the defendants' car came along, being driven by a colored boy, and that the little boy, the plaintiff, was standing on the curbing at the edge of the parking in the center of the street, and that the driver of the car either thought the boy was going out in the street, or for some reason, which we do not know, started his car upon to the parking in the center of the street and run over the boy—hit him on the back of the head and knocked him down.

"Now, it has been our information that the defendant claims that the boy came from the other side of the street next to the house and was crossing over to the parking in the center of the street. We do not think that is correct, but, however, it is our position that whichever way the boy was, that the defendants are responsible for the hitting of the boy. The defendants themselves were not in the car, but it was being driven by their driver, and under the· facts and under the instructions given to you by the court, you will be advised that the defendants are responsible just the· same as if they were driving the car, if·

there was negligence on the part of the **driver.**"

The remaining portion of the opening statement was devoted to detailing the injuries received and their effect upon the plaintiff.

The opening statement of the attorney for the defendants can be found at page 81 of the case-made, and, in that statement, it was claimed that the car was being operated with all care, and that when it became apparent that there would be a collision with the child, the car was turned as quickly as possible upon the curb, and was stopped as quickly as possible, and that it was an unavoidable accident. At page 82, this statement is found in the opening statement by the attorney:

"The evidence will show that this boy was a four year old boy, a little white boy, that the driver of the car was a negro, and owned by Osage Indians. We realize that that is a fact, and we realize that that will be evidence that might in some way be tending to prejudice. We want you to understand we are fully aware that the accident did happen, that upon the happening of the accident, the negro, together with the son of these defendants, picked this little boy up, took him to the hospital. Doctor Shoun, who is in charge of the hospital, took charge of the child. An examination was made, and that nothing showed in that examination that the child was injured."

There was a further statement that at the instance of the defendants, the child was kept in the hospital, and that when discharged there were no signs of injury, and that the accident occurred on the 5th day of February, and until the action was brought on the 21st of June, the injury was not made known to the defendants. There was a further statement that the driver, in an attempt to safeguard the life of the child, turned his car into the parkway, and stopped in the length of the car, and they further claimed that there was no negligence, and that everything was done to avoid the accident.

Under these conditions, it was incumbent on the plaintiff to establish the allegations of negligence as claimed in the petition, and as claimed in the opening statement. As applied to this case, the eyewitnesses to the accident were two children, on the part of the plaintiff, closely related to the plaintiff, and on the part of the defendants below, the driver of the car, a colored man, and a 17 year old son of the defendants, and two adults, who apparently were disinterested, Armiel Staber and Mrs. Anna Sitterly. In the examination of the children, the attorney generally indicated and suggested the answers desired. Fairly illustrating is Mr. Chas. Gray's examination of Freeland Kennedy, as follows (C.-M. 89):

"Q. And it was going south down the street, was it? A. It was going south down the street. Q. Going away from town? A. Yes, sir. Q. Did you see Jack at the time that you first saw the car? A. Well, I looked at the car, and then I looked at Jack, and said, 'Get back or that car will run over you, Jack.' Q. Now, what was the car doing, or where was it when you first saw it? A. When I first saw it, it was about ten or fifteen yards from Jack. Q. What did it then do? A. It ran up on the curb and hit him. Q. Now, Jack, as I understand, was standing on the edge of the curb, of the curbing that is around the parking in the center of the street, is that right? A. Yes, sir. Mr. Walter Gray: We object to it; that is leading and suggestive. By the Court: Yes, you are leading the witness. Q. (By Mr. Chas. Gray): All right, now just go ahead and tell in more details, Freeland, just what the car did; what you saw there—tell these jurors here just what you saw? A. Well, the car came up the street and hit Jack and knocked him out in the street and then it run up on that grass plot there until it got near to the end of it and then it stopped and started backing up, and that fellow that run around in front of the car he run around back down there and picked Jack up. Q. Who run around in front of the car? A. I don't know his name, it was an Indian. Q. I see; now Freeland, before the car hit Jack, was it up on the grass part of the parking in the center of the street? A. Yes, sir, three wheels of it was and the other one—the hind wheel was hitting kind of, the right hind wheel. Q. Was it next to the curb? A. Yes, sir, it was right next to it, it didn't go up on it until it got right near to Jack, and then it went upon the grass plot and hit him. Q. And the whole of the car was up on the grass then at the time it hit him? A. Yes, sir. Q. Now, could you tell what part of the car hit him? A. Well, the right hand bumper hit him. Q. And what did it do to him? A. He just fell and it knocked him out on the street and he just rolled over. Q. Freeland, did this car that was parked there did it obstruct your view of seeing the Haskell car when you first did see it? A. No, sir. Q. You cou'd see it all right? A. Yes, sir. Q. (C.-M. p. 92) Did Jack move during any of the time? A. No, sir. Q. Until the car hit him? A. No, just stood still until the car hit him and knocked him out into the street."

The other child, Dewey Kennedy, was led in the same manner. A sample of the examination is as follows (C.-M. 144):

"Q. Don't know the other boys? A. No, sir. Q. White boys or Indian boys? A. I think there was one Indian and one white. Q. One Indian and one white; did you see that car run into Jack? A. Yes, sir. Q. I wish you would tell the court and these men over here and talk out so that they can all hear you—tell them just what you saw. The Court: Speak right out now loud. A. (C.-M. 144) Well, I saw the car coming up the street and Jack was standing about two and a half feet from the curb, and the car run up on the sidewalk, 25 or 30 feet, I don't know which, and hit him and knocked him down on the street about a foot and a half. Q. Now, did you say Jack was standing about two feet from the curb? A. I said about a foot and a half. Q. About a foot and a half? Which way was he standing from the curb? A. Well, he was standing towards—I just don't know for sure which way he was standing. Q. Was he standing out in the street or on the grass? A. On the grass. Q. On the grass? And you say the car run up over the grass? A. Yes, sir. Q. Hit him? A. Yes, sir. Q. What part of the car hit him? A. The front bumper. Q. What happened when the car hit him? A. (C.-M. 145) It knocked him out in the street. Q. Now, what did the car do then? A. Well, it run on up there beside the curb and stopped. Q. The way it was going? A. Yes, sir. Q. Could you tell how far it went up there, or where it went to? A. No, sir, I didn't—no, sir, I couldn't. Q. Did Jack move after you saw the car coming? A. No, sir."

This witness was eleven years old. According to the picture in evidence, there was no sidewalk along the center parking. Between the sidewalk and street there was parking of considerable width. According to the testimony so elicited, the little boy was in a safe place, and the car was 10 or 15 yards away, and Jack was warned to "get back or that car will run over you, Jack."

Freeland Kennedy, at the time of trial, January, 1929, was 13 years old, and was playing marbles across the street from where the child was injured, and 5 or 10 feet from the sidewalk, about even with the engine and 10 feet out from it. He claimed the other children were swinging around the trees in the center of the parking.

Another witness for plaintiff, Rudd, did not see the accident, but got there shortly afterwards. He saw blood from the mouth and ear of the injured child, though no one else did. He was interrogated in the same manner, and says:

"Q. (By Mr. Gray): I believe you said that you saw this car going south up the street before this collision happened? A. Yes, sir. Yes, sir. Q. (C.-M. 114) Now, where was the car when you saw it at that time? A. Well, the car was down at the lower end, at the north end of the center parking coming up when I seen the car. Q. (By the Court): How far from the scene of the accident? A. Oh. I guess —let me see, now—probably one-half block they were. Q. (By Mr. Chas. Gray): Could you tell how fast the car was going at that time? A. Well, I judge the car was going something like 25 or 30 miles, somewhere. Q. How did you come to notice the car? A. Well, I—the car passed, and I thought it was driving a little fast myself going up through town, and I just noticed the car. Q. Did you know who was driving the car? A. Well, there was a colored man and an Indian man in the car."

This witness also saw the grandmother of the child at the Kennedy home the day of the accident, though according to everyone else she was in a hospital at Oklahoma City. It appears beyond question that the child was found in the street.

If the story of the children, as developed, is true, the running down of the child was not the result of negligence in operating the car, but, apparently, the act of a person so far forgetful of duty that he would risk his own life and that of the son of his employer by running the car at a high speed against the curbing, with no reason therefor. One of the children eyewitnesses placed the car on the sidewalk. The other on the other side of the paved portion of the street.

In the brief of the defendant in error, at page 51, appears the following suggestion:

"The driver unquestionably drove up on the curb to avoid hitting the larger boys who were ahead of Jack, and Jack apparently stopped on the edge of the curb and still on the parking where he had no doubt been taught was a place of safety, but he was knocked down by the careless driver of the ponderous vehicle who had without doubt given no thought to the consequences of his recklessness."

If this suggestion is well founded, it would not necessarily follow that the owner of the car was liable, if, in an effort to save the larger boys from being run over, the driver ran over the curb and hit the other boy.

The answer of the witness Armiel Staber, at case-made, page 281, is as follows:

"Q. Which side of the street did this child come from? A. It looked like to me he came from the green first, and then kind of went back out there, and then they run

back and forth so many times I never noticed it, but when he got hit he was right on the curb. Q. Did you see the driver when you saw the child as he run out, just tell what happened then on? A. Well, they tried to miss the child, but did not, and just hit him a glancing blow."

Mrs. Sitterly, apparently disinterested, and being on the opposite side of the parking, saw the accident. She drove a service car, and related how the hurt child came from behind the car in front of the driver, who suddenly turned to avoid hitting the child. The driver and the other occupant of the car testified that the child came from behind the car, and to avoid hitting him, the car was turned to the parking.

No effort was made by plaintiff to establish any of the other allegations of negligence as to the condition of the car, but there was a great deal of evidence tending to show the extent of the injuries and in the minutest details. At the same time, unnecessarily, were insinuations thrown by counsel for plaintiff below, with reference to the colored driver and the Indian owner, and undertaking to make the appearance of substantive evidence, by asking witnesses questions under the guise of impeachment, to be followed by evidence of statements of witnesses contradictory and often with no attempt to follow up. A fair illustration of this is found on page 313 of the case-made, with reference to putting the Indians in jail for running over the child. Again the pleadings in the case started out by characterizing the defendants as Osage Indians with large incomes, though the court did strike the words "Osage Indians," leaving the allegations about incomes in.

Everyone on the jury probably would know that the defendants, when they testified, were Osages. Fairly illustrating is the proceedings found at page 272, where objection is made to the son of the defendants, an occupant of the car, testifying, because he was not the driver. Again, at page 275, is another example of what appears to be on the same line, as follows:

"By Mr. Chas. Gray (examining the son of defendant): Q. Bryan, how old are you? A. Seventeen. Q. How old are you? Talk so that the jury can hear you. The Court: Seventeen, he said. By Mr. Chas. Gray: Q. Do you remember one night last summer when Mrs. Kennedy and I drove up to your father's home? A. I don't know, I forgot now. Q. Do you remember you came out Mr. Walter Gray: We object to this as not cross-examination. By Mr. Chas. Gray: Q. And talked to us. The Court: Overruled. Mr. Walter Gray: Exception. The Court: Do you remember coming up and talking to them? (No response) By Mr. Chas. Gray: Q. Do you know Mrs. Kennedy? A. I don't know her but when I see her. Q. The grandmother of this boy? A. One—let's see— I forgot now, I believe you did come out there and talk to me. Q. You remember about that, don't you, last summer, we asked if Ben Johnson —if Ben wasn't there? A. I think yes, sir. Q. Do you remember that when you stood in front of the car and talked with us a while? The Court: Speak out. A. Yes, sir. By Mr. Chas. Gray: Q. Do you remember about that? Do you remember stating to us at that time, Brownie, these words 'The kid ought to be killed anyway?' Mr. Walter Gray: We object to that. By Mr. Chas. Gray: Q. Do you remember that? Mr. Walter Gray:—as not proper cross-examination and never brought out—The Court: Sustained. Mr. Chas. Gray: Exception. Mr. Walter Gray: And we ask that the jury be admonished not to consider that. Mr. Chas. Gray: It is competent for several purposes. The Court: Well, I don't think so. Mr. Chas. Gray: It shows his attitude about the matter and it is impeaching. Mr. Walter Gray: I ask that the jury be admonished not to consider that. The Court: Sustained, and the jury will be instructed not to consider it. Mr. Chas. Gray: Exception. Mr. Chas. Gray: That is all. Mr. Walter Gray: That is all. (Witness excused)"

The lower court felt impelled to instruct the jury in instruction No. 19 (C-M. p. 351) as follows:

"You are further advised that it is your duty to decide this case upon its merits, entirely disregarding the fact that the defendants are members of the Osage Tribe of Indians, and as such are possibly possessed of considerable funds, and the further fact that the plaintiff, Jack Kennedy, is a mere child, whose parents may be regarded as of slight financial means. Your verdict should be based upon the evidence as given you from the witness stand, and the law as given you by the court, and not upon prejudice or sympathy."

In cases of this kind, the automobile owner has the right to use the paved street. Under modern conditions, rapid transit seems to be the watchword. The pedestrian has rights that the automobile driver must respect. A paved street is a place of danger. The opportunities to be killed or maimed are abundant. They are not adapted as playgrounds for children, large or small, but the automobilist must recognize that a child is a child, and must keep a reasonable lookout for him, and if discovered, use reasonable care to avoid injuring him. According to the great weight of evidence here, this was done by the driver, who does not appear to

have been. either careless or willful, as he risked his own life in trying to avert a calamity to the plaintiff or some of his playmates.

Under our law, negligence must be proved as alleged. See Wilson v. Roach, 101 Okla. 30, 222 Pac. 1000, and Mead v. Chickasha Gas & Electric Co., 137 Okla. 74, 278 Pac. 286.

The motion for new trial, found on page 365, set up misconduct of the prevailing party and excess in the amount of the verdict, and the manner of its assessment and its not being sustained by sufficient evidence, and being contrary to law, and errors of law occurring at the trial, and error in overruling a demurrer to the evidence, and in refusing to direct verdict. As enlargement on these, complaint was made of instructions Nos. 1, 3, 4, 5, 6, 7, 9, 10, 11, 15, 16, and 18, and the refusal of instruction No. 2, insufficiency of evidence to support verdict. Assignments of error are made covering the points.

The evidence of negligence of the driver in this case is not satisfactory. It does not appear reasonable that the driver would have run over the curb except as a result of pressing necessity. He had a right to use the street. He may have been traveling over the 15 miles per hour permitted by the ordinance, but the average automobile speed is far greater than that; in fact, in some places a speed of twice that would be a nuisance as being too slow. The record does not show that the speed of the car caused the accident. However, even at 15 miles an hour, running over a 6-inch curb would be highly dangerous to the driver and the car he was driving, and would likely cause the car to upset.

Our Constitution, in section 6, article 2, guarantees to every one in our courts that "right and ·justice shall be administered without sale, denial, delay, or prejudice."

Section 3 of the Enabling Act provides that, in the Constitution, there shall be no distinction in civil or political rights on account of race or color. The petition in this case calls special attention to the fact that the driver was a colored man and the owners Osage Indians, each having large incomes, though the court struck out "Osage Indians." The course of the examination shows frequent reference, apparently unnecessary, to the Indians, besides an attempt to introduce matters calculated to arouse the prejudices against the Indians. In the opening statement there is a reference to the driver being "colored." That this was sensed by the attorney for the defendant is shown in his opening statement, where counsel says:

"The evidence will show that this boy was a four-year old boy, a little white boy, that the driver of the car was a negro, and owned by Osage Indians. We realize that is a fact, and we realize that will be evidence that might in some way tend to prejudice."

The court cautioned the jury about it. The evidence largely preponderates as to negligence in favor of defendants below, but the verdict went against them. I cannot believe they have had a fair trial, as vouchsafed by our laws.

A recent case from the United States Supreme Court reverses two courts in the District of Columbia, because in a trial of a negro for killing a white man, the court refused to allow a juror to be asked if he entertained racial prejudice. The case is Aldridge v. United States, decided April 20, 1931, reported in 75 L. Ed. 628. The court cites cases from Florida, Mississippi, North Carolina, South Carolina, Texas, California, Washington, New York, and Missouri.

Fairly illustrative of the way this case was tried, is the examination of the grandmother of the child as to his earning capacity, found on page 156 of the case-made. as follows:

"Q. Mrs. Kennedy, you have raised a family? A. Yes, sir. Q. You have grown sons? A. Yes, sir. Mr. Walter Gray: We object to that as incompetent, irrelevant, and immaterial. The Court: Overruled. Mr. Walter Gray: Exception. By Mr. Chas. Gray: Q. Do you know, Mrs. Kennedy, approximately what Jack could have earned when he reaches his majority had he not been injured? Mr. Walter Gray: To which the defendants object for the reason that this witness is not shown qualified to answer this question; and the question is wholly incompetent, irrelevant, and immaterial. The Court: If she knows, she may answer. Mr. Walter Gray: Exception. The Court: You may answer. A. Well, as far as my judgment would be concerned I think that he could—well you know a child up until he is 15—By Mr. Chas. Gray: Q. But I am asking you now, past the time that he is 21. A. Oh, past the time that he is twenty-one. Q. Yes, ma'am. A. From the time he is twenty-one on? Q. Yes, ma'am. A. What I think he might have could earned? Q. Yes, had he not been injured, what his earning capacity would be, I want you to say, if you think you know? A. Oh, he ought to be able to earn $90 to 100 per month, anyhow —anyhow, at least."

A trial so conducted could scarcely be a trial. much less a fair trial. A verdict secured under these conditions should not be allowed to stand. The instructions of the court did not help clarify, instead, they made it worse. They applied the same standards

for an immature child as for a mature man, and applied a standard by which a mature man's conduct was to be gauged out of the ordinary.

Instructions Nos. 11, 13, 15, 16, and 17 left the jury on a confused sea, with individual sense of direction practically obliterated. No 18 places a duty to exercise a higher degree of care, and is more exacting than the evidence in this case justified. This and the next instruction clearly call into prominence things calculated to arouse prejudice. Instruction 11 is as follows:

"You are instructed that the law imposes the duty upon the driver of an automobile to drive his car carefully, and that the ordinances of the town of Fairfax have created a speed limit of 15 miles per hour, and you are further instructed that it is negligence per se to drive a car in excess of the speed limit provided by law; and if you find from the evidence that the car of the defendants was being driven on a street in the corporate limits of the town of Fairfax at a speed in excess of 15 miles per hour, then the driving of said car in said manner was negligence per se, that is, it was negligence in itself; and if you should further find, from a fair preponderance of the evidence, that the plaintiff, Jack Kennedy, sustained injury to his person as a proximate result thereof, then and under such circumstances, your verdict should be for the plaintiff in such amount as you believe from the evidence he should recover, not exceeding the sum of $29,200."

What significance that instruction would carry to the average juror is problematical. Most jurors would conclude that, if the automobile was being driven over 15 miles an hour, the car owner would be liable. Stress is laid by this court on the fact that it was not necessary to publish the ordinance.

Instruction No. 13 is as follows:

"You are instructed that whenever an automobile appears to be stationary upon the street, the operator of an approaching automobile should observe whether or not any person is around or about said stationary automobile; and the driver of said approaching automobile should have his car under such control in passing the standing car so as to avoid any accident to any person who may be around or about the standing car, and so as to avoid any accident with any person who attempts to cross the street in front of the approaching car, provided such person is himself in the exercise of ordinary care; and if you should find from the evidence that the driver of the defendants' car did not have the car under such control, then said driver was negligent; and if you should find from the evidence that the plaintiff, Jack Kennedy, used ordinary care in crossing the street, if you find that he did cross the street, or that he was standing upon the parkway, and that the driver of the defendants' car carelessly and negligently ran defendants' car into the plaintiff, Jack Kennedy, and injured him, without any fault upon the part of the plaintiff, Jack Kennedy, then, and under such circumstances, your verdict should be for the plaintiff in such an amount as you find he is entitled to receive under all the facts and circumstances appearing in evidence."

Instruction No. 18 is as follows:

"You are instructed that if you find from the evidence that it was the custom or habit of children to play about the parking in the center of the street and to cross the street back and forth between the parking in the center and the parking in front of the houses, and if you further find that the driver of the defendants' car knew of those habits and customs of the children, then it was the duty of said driver to watch out for the children and to have and keep his car under such control that he could stop it without running into or over children."

As applied to this case, the latter part of instruction No. 18, coming from the court, is too suggestive. As to the negligence per se, by reason of the ordinance, if the court below had examined the Session Laws of 1915, page 328 and also page 339, carried forward into C. O. S. 1921, and enumerated under sections 10, 140 and 10164, and taken the act of 1927, substituting 45 miles per hour for 35, provided in the Laws of 1923, section 2, chapter 16, regulating speed limits on roads and streets, and repealing all acts in conflict, he would have discovered that a town, if it ever had the power to regulate the speed of automobiles on the street, did not have it at the time of the passage of this ordinance. The street was open, and the view unobstructed.

This court has, in the majority opinion, gone into the lack of necessity of a town publishing such an ordinance. Of course, we should not set traps for the tourist and the man from the country in the small town by passing ordinances, never publishing them, and giving no warning on the street by ordinary signals. It occurs to me that the necessity of giving warning is apparent. But it is questionable as to whether or not the town ever had authority, prior to the act of 1923, and the section of the statute positively forbids its passing such an ordinance. It appears that the court has gone out of its way to proclaim that which is untenable.

Other holdings in the opinion, it seems to me, are not warranted by the facts, but, in view of the fact that the ordinance itself

was not permissible, it seems to me that the case ought to be reversed, largely on the ground that the parties did not have a fair and impartial trial, as well as improper instructions.

I therefore register this dissent.

Note.—See (1) 26 R. C. L. 1061.